May it please the Court. My name is Joel Nomkin, and I represent the appellants, the Alperts, in this insurance coverage action against Chartis, and I'd like to reserve four minutes for rebuttal. Please watch the clock. Thank you. The key question in this appeal is whether Mr. Alpert's whistleblowing statements to law enforcement and other entities arose out of his business pursuits. The district court said that they did, and for that reason, that the statements fell within an exclusion in the relevant policies for business pursuits. The district court was wrong as a matter of law and as a matter of the record, and for that reason, we ask that the summary judgment be reversed with directions to enter judgment for the Alperts. The undisputed facts really drive the conclusion that we seek.  Well, let me just ask something procedurally that I was a little unclear about. The attorneys for the Albertsons, or the Alberts, submitted the case to Chartis Property under the homeowner's policy and asked, as I understand it, for participation in the settlement. I'm not sure that, did they ask for a defense as well? I guess the point I'm confused about is, weren't the Alberts being defended by the business insurance carrier? The Alberts, as my understanding is, they were represented by their own attorney, but I don't think that's in the record, Your Honor. Okay. So my understanding is Because the business insurance carrier did contribute to the settlement. Yes, it did. That is in the record. Yes, it did. Okay. Can you address the settlement agreement? Yes. Which begins with a recital that says, The claims raised in the lawsuit arise out of the employment relationship between ELH and various folks. If the claims arise out of that, why isn't this within the business pursuits exclusion? For several reasons, Your Honor. So the recitals are just reciting what the complaint alleged. Right, but it was a settlement agreement signed by some of the parties in this case who say, This is what this complaint was about, and now we're settling. So why isn't that sort of an admission that it arises out of the employment agreement? Because it's more than that, Your Honor. Because the Alberts were also facing a potential for defamation claims that didn't arise out of a business pursuit. And we know that from several parts of the record. We know that from the complaint itself, which alleges disparagement that the Alberts made, that Mr. Albert made in his statements to law enforcement and other entities. We know that the critical issues for whether the business pursuits exception applied had to do with two things. Did the defamation arise either out of Mr. Alberts' work as a consultant for ELH, or did they arise out of Mr. Alberts' what we call his subsequent business? And we know that there is evidence that the insurance carrier had an obligation to consider that shows that at least there was a potential that his alleged defamatory statements didn't arise out of either. But why don't we have to read this complaint, which doesn't seek damages for defamation, as a defamation complaint in order to accept your position? Yes. And in the claims process, Chartist conceded that the complaint created a potential liability for defamation. And that's really the test under Arizona law, as Your Honor well knows. If a complaint has the potential for coming within the coverage, if any claim in the complaint has the potential for coverage, then the insurer has the obligation to defend the lawsuit. So let's go back to the what do you believe the arising out of test is in Arizona? Well, it's Because that's the central question in this case. These claims here are not unrelated to his business activities. They have some firm connection to his business activities. Are you saying that you're not saying that the whistleblowing must be part of his business activities, are you? No, I'm not saying that, Your Honor. But we know from the Fimbers case, the Court said we understand this clause to refer to business pursuits conducted on the insured's premises. The term arising out of implies a causal connection. So what does that mean? So let's, if we could examine the two businesses that are relevant separately, I think that would be helpful. So did Mr. Alpert's statements arise out of his consultancy? Well, we know that the statements, the defamatory statements, were made about 14 months or more after the consultancy ended. Okay. So let's just, let's assume he had never had another business. The consultancy ends. He discovers that when he was employed or contracted to these companies, he always uses ELH as a wastebasket description of them. He discovers something was rotten in Denmark 14 months later, and he says, I've got to set the record straight because I was an employee. You're saying that doesn't arise out of his business relationship? Because that's essentially what happens here. There's another set of contacts in between. But just leave the first one. Your Honor, first of all, may I address the premise of your statement? Which is, there are two sets of statements that he's making, one to Verizon and the other to law enforcement. And I want you to address them both. Okay. So I would argue that for both of them, the temporal disconnection between when he made the, between when his employment ended and when he made the defamatory statements was enough to sever the connection so that his statements don't arise out of his consultancy. Is there a case suggesting that? Which case are you relying on for that? I'll rely on several different authorities. Couch on Insurance addresses this directly, saying, once an employment relationship is terminated, there is no longer a connection between the employee's actions and the activity of the employer's business. Accordingly, the conduct of a former employee following their termination from out of a business pursuit. But the language of FEMBRIS is so broad. It says the term arising out of means originating from, having its origin in, growing out of, flowing from, incident to, or having connection with. So extremely broad. And there's no suggestion that so long as there is a connection, which here there clearly was, the information and the actions when he was working is what led to his setting the record straight, as Judge Hurwitz said. So how do we interpret this very broad language from FEMBRIS and not apply it here? Okay. Of course, FEMBRIS didn't address the situation because tortious conduct alleged there did happen during the business. Right. But we defer to the State court's statement of what their rule is, which is as I explained it. And the quote begins, we understand this clause to refer to business pursuits conducted on the insured's premises. Well, wasn't his business pursuits as a consultant for ELH, I don't know if they were on insured premises, but that couldn't make the difference now that we have telecommunication, you can work from home. Right. But the information he got, the problem that he then sought to rectify, arose from his employment relationship, whether on the insured premises or not. I would argue that's not the case, particularly with the information that he conveyed to law enforcement. It didn't arise out of his work at ELH because it's based on information. I'm sorry. I'm not finished. Please. It's based on information he learned in the Chadwick letter 7 months after his work ended. But the problem he was seeking to rectify, I mean, had he gotten the Chadwick letter but not had done any work for ELH and made those representations on ELH's behalf, the Chadwick letter information would be largely irrelevant. Correct? I'm not sure I'm following the question, Your Honor. Had he not worked for ELH and made representations on ELH's behalf, any information in the Chadwick letter would have been entirely irrelevant. There is a connection. If he had never worked at ELH, he wouldn't have gone to the authorities. I think that's a fair inference. But that's not enough. And I don't know. Let me ask a question before you move on. So let's assume that he made all these statements while still employed, or I don't know whether it was an employment relationship or an independent contractor relationship, while still employed at ELH. Would the exclusions apply? I'm sorry, Your Honor. Could you repeat that? So he says exactly the same things that he says to Verizon and the various law enforcement authorities, but he does it while still under contract to ELH. Does the exclusion apply? That would be a much tougher case for us if he made the statements. I think it would, too. And so what you're saying is because he waited and learned more information, then the exclusion applied. That is your position, isn't it? Yes, and there's a policy reason. I mean, there's a good reason for that, and it goes to interpreting what the business pursuits exclusion is all about. I mean, the reason for the business pursuits exclusion is because you don't want to assume that a homeowner's policy or an excess liability policy is covering the risks associated with the operation of a business. But that purpose doesn't have any meaning when it comes to statements that are made 14 months after the business relationship is over, and they're not in furtherance of that business. They're not in furtherance of his consultancy. Did you want to save your time for rebuttal? I do, Your Honor. There's much more to say, but I'll save the rest. Thank you. Good morning, Your Honor. My name is Stephen Maceros. I represent Chartist Property Casualty Company. I agree that, with my opponent, that the key issue in this case is whether the complaint filed by ELH arises out of Mr. Alpert's business pursuits. Can we start with the question I asked, Mr. Nopkin? If this complaint alleges defamation, if it raises claims for defamation, you are required to cover absent the business exclusion, correct? Correct. And does it do you contest that the complaint raises defamation claims? The complaint describes an 18- or 14-month pattern of conduct. Right, but that's not the question I'm asking. The question I'm asking is, let's assume you had no business exclusion here. Would you be required to cover and required to defend and indemnify in this case? Well, a defamation claim is a potential personal injury claim in a homeowner's policy, but it's not subject to, when you read the complaint, it's they don't Well, I'm just trying to find out what your position is. What's your position? Our position is, sorry, Your Honor, is that a defamation claim, if he tweets on a, puts out a tweet and generally and says I just want to interrupt for a moment. So we're looking for a yes or no answer. Would the insurance company have had a duty to defend Mr. Alpert? Would they had a duty to defend On defamation. Absent the business pursuits exclusion. Just yes or no. Oh, absent the business pursuits exclusion? Yes or no. Not the, probably. No, you don't get the, you don't get to do probably. No, I don't, not this complaint. There was no obligation to defend this complaint. Well, see, that's my question then. Are you saying you had no obligation to defend this complaint because there was a business exclusion, or are you saying we had no obligation to defend this complaint because there was a business exclusion and it didn't raise a covered claim? We never got beyond initially the business exclusion. So at that point, they probably would have defended the complaint if there was a defamation claim or at least a. So are you saying that your client didn't analyze whether the complaint raised a defamation claim that was covered because you were looking only at the business pursuits exception? Yes or no? Our client isn't obligated to, the duty to defend is triggered by the complaint. The Kepner case and the U.S. F&G case expressly state that if the complaint as pled does not fall within the duty to a covered claim, there's no obligation to defend or investigate any further. The exception to that is under U.S. F&G, unless the insured provides a factual showing that there's something within facts outside of the complaint that would create a covered claim. So that was the whole purpose of their saying, well, we have this information and they, we kept saying please provide it, we'll consider it. And they didn't do it, they didn't do it, they didn't do it. We asked for it many times and they finally did it and then they settled the case. Well, I'm looking at your denial of coverage letter, which is July 18th, 2011. Your chart is this, obviously. And it says, although the allegations in the complaint do create a potential of liability for personal injury, offensive, defamation, libel and slander is more fully set forth below. We disagree with your conclusion that the business pursuits exclusion is inapplicable. So really the position you've taken is we would have covered this but for the business pursuits exception, right? Essentially. I believe there were, I believe there were, yes. So let's move on. You agree with Mr. Nomkin that absent the business pursuits exception, you would have had, the chartist would have had a duty at least to defend, perhaps under reservation of right, but at least a duty to defend. But for the allegations in the complaint, yes. But the, I want to know why you're, the allegations in the complaint are with respect to the business pursuits exclusion, aren't they? Not with respect to defamation. Because you sent a letter that said the allegations in the complaint, your lawyers sent a letter that said the allegations in the complaint do appear to create a potential for personal injury for defamation. Correct. But we're not covering you because of the business pursuits exclusion. Is that your position? That was their, certainly their position. Is that your position today? I'm sorry? Position today too, right? That was their position then and that's your position today? Clearly. Okay. So now let's turn to the, so we're only relying on the business pursuits exclusion. What if we were 10 years after what happened? Mr. Alpert is 10 years removed from any connection with the NIH. Well, let me finish. I'm sorry. And he goes to, he does, he sends out exactly the same letters. Is it covered by the business pursuits exclusion? Well, if you look at the complaint, first of all, the complaint alleges that the false indiscretion. Stop for a second. We're missing each other. I'm asking you a hypothetical. About the 16-year, okay. I'm asking a hypothetical. I would cite the court to the Gettle case where the business pursuit ceased 16 years before the injury occurred. And they said, they specifically held, it doesn't matter. It arose out of a commercial activity. That's all that's required. That dispels this whole 14 months or however much time. Well, do I understand your position to be that there is more or less a bright line rule that if you're reporting, whether you want to call it as a whistleblower or whatever your motive is, if you're reporting something to a third party that is potentially defamatory, but you acquired that knowledge as an employee, that that automatically puts you in the business exclusion? I don't think there can be any bright line drawn. Well, let's make it a simple hypo. I'm an employee. I find out that the purchasing agent's embezzling. So I write a letter to the CEO and I write a letter to the police and I say, John Doe is embezzling from the company. Doe now sues me. And regardless of whether it's before or after, I'm working. Clearly could be considered a covered claim, but for the business exclusion. You're saying because I learned about that information as an employee, I'm no coverage. I believe that based on the Arizona cases, as long as it's connected or related to the business pursuit, that's enough. They specifically rejected this, where you look at the specific act in a vacuum and say if there wasn't a business pursuit for that specific act, it's not they that has been rejected by the Gettle case. It was rejected by the Fimbers case. In the Weichnick case, the negligent act was cleaning up after the dog when the babysitter was doing it, and they just said that doesn't matter. The fact is that the child was there because you were babysitting. The negligence, the specific act, you can't focus on that and say it wasn't a business pursuit. As long as it's related to or incident to or in connection with commercial activity, which you read the complaint and even read his deposition, and there's no question that this whistleblower stuff is just a fabrication of counsel. He said no more than 10 to 13 times in a deposition before he even knew about the lawsuit. The deposition was taken before he got served with this lawsuit. It was taken in a different suit. And he was asked numerous times, why did you do this? And he said I was afraid because I was a consultant for ELH that people were going to sue them and they were going to sue me, too, because I was a consultant and I was part of their alleged consumer fraud. He was protecting himself and his family. Even when he said I was soul-searching, he specifically said, and it's on page 50 of his deposition, 58 of his deposition, I was soul-searching because people believe I did this to hurt the owners of ELH. That's not why I did it. I did it to protect myself and my family from getting sued because of my business relationship with ELH, because when I was there, I made false statements unknowingly and I did this to correct the record. That's and, Judge, Judge. I don't think that's contested here. I think that, I think the other side says that's exactly why he did it. He was involved with, he was involved with ELH. He made some representations while involved with ELH. He learned, taking the facts most favorable to your opponent, he learned that those representations that he made while at ELH to outside folks were wrong. He thought that there was wrongdoing, and so he went to everybody he could to correct the record. We're not fighting about that. The question is, is that kind of activity as a matter of law within the business pursuits exclusion? Absolutely. Absolutely. Tell me why. Because, well, because. Because there's no contest about what happened. Because of the entire context. See, what they're trying to do is isolate little facts. The complaint alleges, you know, 60, 70 paragraphs. They take two words, false statements, and say, ah, personal injury defamation. No, no. False statements. You're losing me again. So let's try this. You said a few minutes ago we rely entirely on the business pursuits exclusion, and I think that's a correct position because it's the one you took before. We have an uncontested series of what he did. Nobody's disputing what he did and why he's being sued for it. The question is, why are those statements to law enforcement authorities and to Verizon within the business pursuits exclusion? Just help me with that. Tell me why they are. Because they were all, he admitted, they were all made in connection with or related to not just his consulting. That was the beginning of it. But he had an ongoing multiple business disputes because, you know, again, it doesn't stop with the consulting. That was the genesis. It went with the hiring away of employees and disclosing confidential information and starting new businesses to allegedly compete with them, which is the reason why it's alleged in the complaint and why it's on its face, is not a personal injury covered by a homeowner's policy because it expressly states the false statements were made for business reasons. See, that's where I'm having trouble following your argument. I hear one argument being it's because he learned of this, it's because of something he did and something he learned about while consulting. But now your argument seems to be, well, no, it hasn't, that's not the real problem. The real problem is he's now in competition. He has all kinds of other disputes because he supposedly poached employees. And now you seem to be arguing, well, he made all these statements as part of this new business and that that's the business pursuits exclusion problem. So is it the new business or the old business? It doesn't matter. It doesn't matter, but he asked you which one it was. It doesn't matter. It has to arise out of a business. So tell me, no, stop for a second. It has to arise out of a business. Tell me what business it arose out of. Again, it arose out of all of them. So it arose out of both his employment at ELH? If I may, the industrial. I'm asking. It arose both out of his employment at ELH and from his subsequent business? They're all connected. They're all connected. It was, if I may, the industrial indemnity versus Gettle case specifically stated, use of plural pursuits suggests a more expansive construction. Profit motive applies to the business pursuit, not to the isolated activity. So it doesn't matter if it's multiple businesses or if it's one. As a matter of fact, our business pursuits exclusion is more expansive because it includes investments. I know at one point he says, I'm not a consultant. I'm an investor. Well, this applies equally to his investments. And the point is, is that it started with the consulting business. You know, the complaint is very clear. Then it goes to hiring people away and violating his contracts that he had with ELH about the confidential information, then starting competing businesses and continuing to hire people away. As a matter of fact, the whole genesis of the false statements that he made to Verizon was he had a business dispute, he had a joint defense agreement with his new employee, Chadwick, who he took away from ELH. And ELH wrote a cease and desist letter to them. Their response was done by their attorney. He admitted they met with their joint defense attorney for the purpose of protecting himself and his family from suit. Let me interrupt you for a moment because I think we're aware of these facts. Could you briefly address your collateral source rule argument that because James paid, the James Company paid, there was no damages to Mr. Alpert? And explain to us how Arizona law would apply to that. Well, in a nutshell, and I've got a few seconds left, first of all, they didn't argue collateral source in trial court. This is a new argument on appeal, so it shouldn't be considered at all. Second, collateral source rule applies to tort claims. It doesn't apply to contract claims. This is a contract claim. This is, you know, do we owe them for their defense costs, which they never submitted anything, or do we have to pay for the settlement, which, again, their company paid for. Mr. Alpert was never obligated to pay the money. That's the question Judge Akuta was trying to ask. Let me ask it. I know your time's run out, but I want you to answer it. You argue on appeal that because Mr. Alpert didn't pay a penny out of his own pocket, but rather the money came from James, as I understand it, that you wouldn't have to cover it anyway, that he didn't suffer any liability. Isn't that your – is that your argument? The settlements don't say he has to pay it. He has to cause it to be paid, and he didn't pay it. They didn't provide any proof that he paid a nickel out of his pocket. Period. So your position, just so that I understand it, is that because somebody else paid the judgment, at the end of the day he suffered no liability? Is that your position? Suffered no loss. No loss. And therefore, even if you were required to cover him, there's no evidence of loss? Correct. Okay. I just – that's the question I think Judge Akuta was asking. Okay.  Thank you. I'd like to return to the standard that we're operating under for the duty to defend, which is, is there a potential for coverage? And on this record, there is at least a potential for coverage. The statements that were made, particularly the statements to law enforcement, were made after the employment relationship or the consultancy ended 14 months later, based on information that he didn't know at the time of the consultancy, but that he learned seven months after the consultancy ended. If you were right, what would we do in this case now? There was a settlement. One insurance company kicked in $300,000 for it, apparently concluding that it related to business pursuits. We don't know how much of the settlement related to defamation claims or to other claims. What remedy are you seeking? And also address this James argument that they make. The remedy we're seeking is that Chartist be directed to pay the entire $600,000 that was not picked up, and I'll tell you why. Tell me why that all arises out of defamation, because there's a lot of non-defamation claims in this case. It may not. And if Chartist had stepped up to the plate and met its duty to defend, they would be able to argue that the money should be allocated to other claims. But under Arizona law, that's the price that it gave up. That's what it gave up by refusing to defend. Why isn't you said it would be responsible for the $600,000 that the other insurance company didn't pay. Why wouldn't it be responsible for all $900,000 if the payment from a separate, I understand, entity covered the other $600,000? I wish I would have thought of that, Your Honor. I mean, in other words. That makes a lot of sense, and I didn't think of it. But what I'm understanding from that is you understand if there's another source to cover the settlement amount, then the additional insurance is not required. The payment is not required. I'd like to focus on the language of the insurance policy that Mr. Albert paid for. And the insurance policy requires Chartist to pay damages and insure it is, quote, legally obligated to pay. So they breached the contract, but there's no damages because the full $900,000 was paid. So I want to understand why the argument that James' coverage of the remainder doesn't eliminate damages. I don't think that James' payment, the fact that James paid is relevant at all. It's like another insurance company. So if he had another insurance company, completely separate from him, kick in the other $600,000, I don't think we would be here. That's correct, Your Honor, although I must acknowledge I haven't looked at the insurance policy to see whether or not by its own terms any amount would have to be reduced by sums that were paid by another insurance company. But an important case, I think, that is very helpful for this is the Delaware Supreme Court's decision in AT&T v. Clarendon, which was applying California law, and it looked at the language very similar to what we have in our policy, the legally obligated to pay, and held that that language required an insurance company to pay for the employee's settlement and defense costs, even though the employees didn't pay them, but they were paid by the employer. So in the tort cases that use the collateral source rule, which you cited, it's true that the tortfeasor shouldn't get a free ride. So even if the victim's costs are covered by insurance, the tortfeasor should be punished. So that was the rationale. But is there a — I don't know what the rationale would be for an insurance company. I mean, the insurance company wasn't the tortfeasor, didn't do the wrong. So why would that apply? Why would the collateral source rule apply in this context? Well, Your Honor, I don't even think you need to get to the collateral source rule, although — Okay. I don't think it applies. I don't think that there are any authorities that are contrary to the ones at least — I'm sorry, the appellees didn't cite any authorities contrary to the one that we cited. But I think we have to look at economic reality here, too. The evidence is that Alpert owned Jane's Investment Company. Is it an alter ego? Was there anything in the record showing it was an alter ego? Not that I'm aware of. Does that make a difference? Well, I think, you know, as the Delaware Supreme Court said in Clarendon, the existence of a covered law should depend on economic substance and not transactional form. So, yes, the money came out of one account versus another. But what if he had just paid it himself and then turned around the next day and asked Jane's Investment Company to reimburse him? It's the same. Economically, it's the same point. Thank you. Okay. The case of Chartist Property Casualty Company v. Alpert is submitted. And the next here, Eagle v. Bill Alexander Automotive Center. Thank you.
judges: Ikuta, Hurwitz, Melloy